IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

JAMES A. PALUCH, JR.,       :
       :
       **Plaintiff**       :       **CIVIL NO. 1:CV-06-01751**
       :
       **v.**       :       **(Judge Rambo)**
       :
**J. DAWSON,** *et al.,*       :
       :
       **Defendants**       :

# M E M O R A N D U M

Plaintiff James A. Paluch, Jr. ("Paluch"), an inmate currently incarcerated at the State Correctional Institution at Smithfield in Huntingdon, Pennsylvania, initiated this action *pro se* by filing a civil rights complaint pursuant to the provisions of 42 U.S.C. § 1983. (Doc. 1.) Since filing the complaint, counsel has been appointed to represent Paluch.[1] In the complaint, Paluch names as defendants four (4) corrections officers from the State Correctional Institution at Huntingdon, Pennsylvania ("SCI-

---

[1] By order dated February 28, 2007, the court appointed Lee Swartz, Esquire, to represent Paluch in this matter. (Doc. 51.) Attorney Swartz subsequently entered his appearance on March 20, 2007. (*See* Doc. 56.) Further, on February 4, 2008, Jeffrey T. McGuire, Esquire, entered an appearance on behalf of Paluch. (*See* Doc. 146.) After conducting a telephonic conference on July 1, 2008 with counsel for the parties, the court issued an order clarifying the roles of Paluch's counsel, namely that Attorney Swartz was representing Paluch in matters relating to discovery and Attorney McGuire was representing Paluch in, *inter alia*, addressing any dispositive motions filed. (*See* Doc. 193.)

Huntingdon"),[2] his former place of confinement, as well as Roger Smith, his former cellmate at SCI-Huntingdon.[3] Paluch contends that Defendants failed to protect him from Smith, despite knowing of Smith's history of aggressive and assaultive behavior, and despite receiving multiple warnings and requests for a cell move or separation. Paluch claims that Defendants' deliberate indifference led to Smith assaulting him in their cell on September 9, 2004, thereby causing Paluch physical and psychological injuries. He sets forth both federal and state law claims related to the incident. As relief, he seeks compensatory and punitive damages.

Before the court is a motion for summary judgment, filed on behalf of Defendants. (Doc. 225.) For the reasons set forth below, the motion for summary judgment will be denied.

---

[2] The corrections officers named as Defendants are as follows: Anthony Schmidt, a sergeant in SCI-Huntingdon's Restricted Housing Unit ("RHU"); Frederick Mosley, a corrections officer in SCI-Huntingdon's RHU; Cameron Kendrick, a sergeant in SCI-Huntingdon's RHU; and John Dawson, a corrections officer in SCI-Huntingdon's RHU.

[3] On April 2, 2007, the Clerk of Court entered default as to Roger Smith for failure to plead or otherwise defend. (Doc. 57.)

# I. Background

In addressing the instant motion, the court first will set forth the relevant facts and procedural history. In setting forth the relevant facts, the court will note any factual disputes between the parties by presenting both parties' contentions.

## A. Facts

Paluch was incarcerated at SCI-Huntingdon from February 17, 2004 until his transfer on February 1, 2005. (Doc. 227 ¶ 3.) Prior to arriving at SCI-Huntingdon, Paluch wrote a book entitled "*A Life for a Life: Life Imprisonment - America's Other Death Penalty,*" about prison conditions in the Pennsylvania Department of Corrections, his experiences as a lifer, and the efforts to achieve parole eligibility for lifers. (Doc. 281-1, Paluch Dep., May 22, 2007, 22.) Once at SCI-Huntingdon, Defendant Schmidt saw the book during a cell shakedown prior to September 9, 2004, and asked Paluch if he had made any profits off the sale of the book.[4] (*Id*. at 24-25.) Defendant Dawson was also aware of the book and made several comments to Paluch about it "as a harassing sort of thing" between June and December 2004.

---

[4] During that cell shakedown, Defendant Schmidt also asked Paluch about his involvement in the Pennsylvania Lifers' Association, a group that met at least once a week at SCI-Huntingdon. (Paluch Dep. 34-35.)

(*Id*. at 26.)  Defendant Mosley was also aware that Paluch had written this book. (Doc. 281-7, Mosley Dep., Nov. 20, 2007, 21.)

On August 17, 2004, Defendant Mosley assigned Paluch and Roger Smith to cell GD-1004 in the Restricted Housing Unit ("RHU").  (Doc. 227 ¶ 4.)  Initially, Paluch and Smith communicated with each other, but that changed when a fellow inmate began taunting Smith with information that Paluch was Jewish.[5]  (Paluch Dep. 51-52.)  Defendants also believed that Paluch is Jewish based on his religious practices.[6]  (*Id*. at 38-39.)  In addition, Paluch heard Defendant Dawson tell Smith that "your celly [Paluch] is not white."  (*Id*. at 40.)  Smith expressed to Paluch his dislike for "nonwhites, meaning those that are black, Jewish or any of that affiliation, any type of minority."  (*Id*. at 54.)  Further, staff members and other inmates informed Paluch of Smith's history of assaultive behavior.  (*Id*. at 95.)

On August 20, 2004, Paluch and Smith each received a misconduct report for placing a live mouse on a meal tray.  (Doc. 282-2.)  As a result, both inmates were moved to cell GD-1009 in the RHU on August 21, 2004.  (Doc. 227 ¶ 4.)  Paluch did

---

[5] Paluch is a Messianic Yahwist.  (Paluch Dep. 36.)  He avers that as part of his faith, *inter alia*, he receives kosher meals during religious holy days, attends Jewish services, and wears a skull cap called a kippah, similar to a yarmulke.  (*Id*. at 36-39.)

[6] *See supra* note 5.

4

not object when they were moved together to cell GD-1009 because "[t]here was no real need to at that time." (Paluch Dep. 93.) However, Smith informed Paluch that he wanted a different cellmate. (*Id*. at 70.)

Separate hearings before a hearing examiner on both misconducts were scheduled for August 24, 2004. (Doc. 282-2.) Prior to the hearings, Paluch and Smith discussed the August 20, 2004 incident in their cell. (Paluch Dep. 62-65.) No one else was present at the time. (*Id*. at 70.) Smith threatened to physically harm Paluch if he told the hearing examiner that Smith had placed the mouse on the meal tray. (*Id*. at 64.) Smith then physically confronted Paluch "in an intimidating way." (*Id*.) However, Smith did not raise his hands or fists, rather just came within three feet of Paluch.[7] (*Id*. at 65.)

Later on August 24, 2004, the hearing examiner found both inmates guilty and sanctioned each with sixty (60) days of disciplinary custody in the RHU. (*Id*.) When Paluch returned to the cell and informed Smith that he had told the hearing examiner that it was Smith who had placed the mouse on the meal tray, Smith "[w]asn't too pleased with it, at the time." (Paluch Dep. 67.) As a result, Paluch called Defendant Schmidt to the cell to tell him that "one of us needed to leave this cell, that there is a

---

[7] In an inmate grievance dated September 10, 2004, and in his counter-statement of facts, Paluch asserts that Smith assaulted him on that date. (Doc. 282 ¶ 8; Doc. 282-2 at 2.)

need for separation, or it is possible either one of us is going to get injured - - something along them lines."[8] (*Id*. at 83.) Paluch recalled Defendant Schmidt telling him that he had to submit a request slip for a separation from Smith to Defendant Kendrick, an RHU sergeant. (*Id*.) Paluch completed a request slip, addressed to Defendant Kendrick and dated August 25, 2004, which stated, in part, "my present cellmate Roger Smith . . . and I are not getting along. He is a 'white supremacist,' and I am not. We are not compatible and I'm asking you to please separate us as soon as possible." (Doc. 282-3 at 2.) Defendant Schmidt took the request slip, but later informed Paluch that Defendant Kendrick denied his request for a separation because "unless like you do something to him or he does something to you, that is the only way that he will move you." (Paluch Dep. 83.) According to Paluch, Schmidt returned to their cell one more time before September 9, 2004 and asked, "I see you guys are still celled up, are you getting along with each other." (*Id*.) Smith replied, "yeah, right," while Paluch recalled not responding at all. (*Id*. at 83-84.)

---

[8] An inmate in a nearby cell, John Boskie, heard Paluch request a separation from Smith several times before the September 9, 2004 incident:

> And it's like every time that he asked Schmidt or Moseley about getting him moved, they said, no, what's the problem. He said, me and my cellie aren't getting along. To prevent any trouble, can you please move us or separate us. I don't want to get any misconduct, I don't want him to get no misconduct, can you please move.

(Doc. 281-3, Boskie Dep., Nov. 8, 2007, 26.)

In his deposition, Defendant Schmidt provided a different account of the August 24th exchange. Defendant Schmidt recalled that while he was on a security round of the RHU that day, Paluch verbally asked for a separation from Smith because the two inmates were "incompatible."[9] (Doc. 281-4, Schmidt Dep., Nov. 20, 2007, 9.) According to Schmidt, Paluch gave no specific or concrete reason for a separation other than incompatibility, nor did he explain what he meant by incompatibility. (*Id*. at 18.) Defendant Schmidt did not ask Paluch to elaborate on his request. (*Id*. at 19.) He directed Paluch to put his request in writing to Defendant Kendrick, but claimed that he never received that written request for delivery to Kendrick.[10] (*Id*. at 20.) He did relay Paluch's verbal request to Defendant Kendrick, but had no knowledge of whether Kendrick took any action. (*Id*. at 10.) To that end, Schmidt stated that his role in the RHU was "to simply relay the information to the next person in the chain of command." (*Id*.) Moreover, Defendant Schmidt claimed to have no knowledge of who has the ultimate authority to make a decision to separate inmates. (*Id*. at 10-11.)

---

[9] Defendant Schmidt defined "incompatible" as "maybe some sort of just a personal disagreeance [sic] or that there was something that existed on a personal level that, you know, two guys don't see eye to eye." (Schmidt Dep. 19.)

[10] Defendant Schmidt claimed that prior to the date of his deposition, he had never seen any of Paluch's requests to staff member relating to a separation from Smith. (Schmidt Dep. 11.)

Defendant Kendrick testified at his deposition that he never received Paluch's August 25, 2004 inmate request slip asking for a separation from Smith. (Doc. 281-5, Kendrick Dep., Nov. 20, 2007, 8.) He did recall speaking to Defendant Schmidt about Paluch's verbal request for a separation, but did not understand what Paluch meant by "incompatible." (*Id*. at 8-9.) To him, "incompatible" means "they're not of like personalities. . . . Maybe he had other interests than he did." (*Id*. at 11-12.) When defense counsel asked him, "Did it ever cross your mind that the term might mean that Paluch and Smith were not getting along well together," Defendant Kendrick replied, "No, not really it didn't." (*Id*. at 12.) He also stated "we don't separate people because they're not compatible." (*Id*. at 9.) As a result, Defendant Kendrick did not follow up on Paluch's request, as relayed by Defendant Schmidt. (*Id*. at 11.) He did not question Paluch or Smith at their cell or conduct any investigation.[11] (*Id*.)

Paluch filed an inmate request on August 27, 2004, addressed to a Lieutenant Wilt,[12] an RHU supervisor. In that request, he stated,

---

[11] At his deposition, Paluch stated that Kendrick did not respond to his request to speak with him at his cell at some point prior to the September 9, 2004 incident. (Paluch Dep. 82.) As a result, he was not certain if he actually informed Kendrick of his desire to be separated from Smith prior to that incident. (*Id*.)

[12] Lieutenant Wilt is not named in this action.

> Lt. Wilt: Please help me out. I sent a request slip to you on Aug. 24 via C.O. A. Schmidt requesting to be separated from my cellmate Roger Smith. I also asked Sgt. Kendrick this same request. Smith is a white supremacist and you know that I am not. I am very concerned for my personal safety. If anything does happen to myself or Smith, prison officials will be responsible. We are really incompatible and I am asking you to <u>please</u> separate us.

(Doc. 282-4 at 2-3.) An inmate in a nearby cell, Jamal Bennett, recalled hearing Paluch ask both Defendants Kendrick and Mosley for a separation from Smith based on his fear for his personal safety prior to September 9, 2004. (Doc. 281-6, Bennett Decl., Nov. 16, 2006, ¶ 5.) On one occasion, Paluch told Defendant Kendrick that he would be held accountable if anything happened to Paluch, and Kendrick replied, "Yeah right!" and walked away. (*Id.*)

Paluch filed another inmate request on August 31, 2004, addressed to Defendant Mosley. In that request, he stated,

> Mosley, as you know, Roger Smith and I are not getting along. I'm not looking for any problems with RHU staff. Smith is a white supremacist and I am a Yahwist. We cannot co-exist peacefully. He wants to cell up with Charlie Campbell (FF-1812) on D2. Please give me another cellmate, preferably white.

(Doc. 282-5 at 2.) When Defendant Schmidt was asked if this type of request would lead to a separation, he responded,

> Based on what's written here in front of me and looking at it, we make no separations, if you will, based upon a person being a white

9

supremacist or a Yahwist unless one was black and one was white, and then there would certainly exist a problem based upon race simply having a white supremacist and a black person together.

So, based on that merit alone, no, because this to me, looking at it, Smith is a white supremacist. I know Paluch to be a white or Caucasian, and according to his request he's a practicing Yahwist. To me I don't understand the degree of separation between a white supremacist and a Yahwist. I don't understand the beliefs of a Yahwist or the beliefs of a white supremacist.

(Schmidt Dep. 29.) Further, Defendant Mosley initially testified at his deposition that he would have denied Paluch's August 31, 2004 request because he read it as one for a convenience move, which is impermissible in the RHU. (Mosley Dep. 8.) However, he agreed that a request for separation would be granted when "a Jewish person is celled with a white supremacist and the Jewish person requests another cellmate." (*Id*. at 11.)

Paluch sent another request slip, addressed to Defendant Mosley, on September 8, 2004, which stated, "Would you please consider moving me in the same cell with Jason Betz FB 4105 if he is on DC status. If not, could you please just move me out of this cell or separate myself from my current cellmate?" (Doc. 282-6 at 2.) Defendant Mosley responded on September 11, 2004 as follows: "You are a double-celled inmate, so you will not be left alone in a cell by yourself. There are no

convenience moves done in the RHU." (*Id*.)  Mosley did not look into the matter any further.  (Mosley Dep. 7-8.)

An inmate in a nearby cell, John Boskie, heard Paluch talk to Defendants Schmidt, Mosley and Kendrick about problems with Smith approximately eight times. (Doc. 281-3, Boskie Dep., Nov. 8, 2007, 64-65.)  According to inmate Boskie, Paluch asked to be separated from Smith on all occasions: "generally he's saying can you please move me or my cellie, we're not getting along, I don't want nothing to happen, can you move one of us before something do happen."  (*Id*. at 65.)  The response by the corrections officers was "either suck it up or until you do get into a fight, they ain't interested."  (*Id*. at 66.)

On September 8, 2004, Paluch asked Defendant Dawson to place him on the shower list.  (Paluch Dep. 31.)  Dawson denied the request, replying, "Jews don't get showers."  (*Id*. at 32.)[13]  Inmate John Boskie heard Dawson's comment.[13]  (Boskie Dep. 18-19.)  Inmate Jamal Bennett also heard Dawson's comment.  (Bennett Decl., ¶ 6.) Defendant Dawson, however, denied he ever made such a statement, and, in fact,

---

[13] Inmate Boskie stated that Defendants Schmidt and Dawson mistreated Paluch by denying him showers, meals, exercise time in the yard, and basic necessities like toothpaste and underclothes exchange.  (Boskie Dep. 15-19.)  When Boskie asked Dawson why he mistreated Paluch, Dawson responded, "he's a piece of shit, he's a Jew boy.  He doesn't like black guys either."  (*Id*. at 23.)

11

denied ever knowing of Paluch's religious beliefs. (Doc. 228, Dawson Dep., Nov. 20, 2007, 15.)

The following day, an incident involving Paluch, Smith and Dawson occurred. Paluch's recollection of the September 9, 2004 incident is as follows. On that morning, Defendant Dawson was doing a security round of the RHU when he approached Paluch and Smith's cell. (Paluch Dep. 71-72.) Dawson whispered something to Smith, who subsequently pointed to a grievance form on the cell door that Paluch had placed there for filing. (*Id*. at 72.) Paluch overheard Smith tell Dawson that the grievance addressed Dawson's comment to Paluch about the showers made the previous day. (*Id*.) According to Paluch, Dawson replied, "Why don't you F up your celly for me," and whispered something to Smith. (*Id*.) Inmate Boskie recalled Dawson stating, "Smitty, we got them hoagies this afternoon, why don't you fuck up your cellie for me." (Boskie Dep. 27.) Further, inmate Bennett remembered hearing Dawson say, "Why don't you fuck your celly up for me? It's hoagie day. I'll make sure you get an extra tray and get you moved to the next block." (Bennett Decl. ¶ 8.)

Defendant Dawson returned to the cell later that morning in order to escort Paluch to the prison yard. (Boskie Dep. 30.) Paluch approached the cell door and

placed his clothes in the food tray slot.[14] (*Id*.; Paluch Dep. 74.) At the time, Smith

was on the top bunk. (*Id*.) Dawson directed Smith to "cuff up first," and Smith

jumped down from the top bunk.[15] Paluch turned around to get out of Smith's way,

and Smith hit Paluch on the left side of his face above his left eye. (*Id*. at 75.) Paluch

fell backwards over the toilet, and Smith hit him two more times on the head. (*Id*. at

75-76.) Paluch believes he briefly lost consciousness. (*Id*. at 77.) Paluch then

crawled under the cell's desk and heard Dawson say to Smith, "all right, that is

enough, leave him alone." (*Id*.) Then Dawson yelled, "Paluch hit Smith!" (*Id*. at

77.) After he made this declaration, Dawson directed Smith to cuff up and removed

him from the cell. (*Id*. at 78.)

> Inmate Boskie's recollection of the incident is as follows:
>
> Dawson had told Paluch to strip. He stripped to my knowledge. He said,
> all right, get dressed. Then he said, hey, Smitty, come on over here to
> get cuffed. Then five seconds later you hear a loud smack like it was a
> punch like somebody hit the door real hard.

---

[14] Paluch explained that, for security reasons, inmates are strip-searched before leaving their cells for yard time. (Paluch Dep. 74-75.)

[15] Defendants aver that guards will cuff up the inmate who is not going to yard first. (Doc. 227 ¶ 22.) In his counter-statement of facts, Paluch denies this fact, stating instead that often the inmate not going to the yard was left in his bunk while the inmate going to the yard was cuffed. (Doc. 282 ¶ 22.)

> Then you heard Dawson say, oh, Jimmy, that must have hurt. Then you hear him laughing. He said, all right, Smitty, all right, Smitty, back up, whoa, Tiger. Then you see all these other officers coming on the pod and they start walking that way. Dawson telling them, come check this out.
>
> * * *
>
> Then he told Smith to come get handcuffed. Then they took Smith out, and that's when I seen blood on his hand and I seen Dawson just laughing as they're taking the boy to the shower - - Smith to the shower.

(Boskie Dep. 30-31.)

Immediately before the altercation, inmate Bennett heard Dawson quietly say, "Get him." (Bennett Decl. ¶ 10.) He also remembered hearing Dawson declare, "Paluch hit Smith," and saw the guards laughing and "enjoying themselves." (*Id*. at ¶ 11.)

The next day, Defendant Dawson filed a misconduct report against both Paluch and Smith describing the incident. (Doc. 228 at 33, 38.) In his version of the incident, Dawson stated, in part,

> I ordered inmate Smith to get out of bed and be cuffed. When inmate Smith put his hands out to [be] cuffed, inmate Paluch punched inmate Smith in the neck. Smith yelled what the hell then back[ed] into the corner. Inmate Paluch then kicked inmate Smith in the right hip area. Inmate Smith then hit inmate Paluch one time then backed into the corner.

14

(*Id*. at 33.) Dawson provided a similar account at his deposition. (Dawson Dep. 15-20.) However, he was not able to recall if prior to the incident Paluch had already taken off his clothes and shoes in preparation for the strip search. (*Id*. at 20-21.)

On September 10, 2004, Paluch filed a grievance with respect to the September 9, 2004 incident. (Doc. 282-2 at 2-3.) In that grievance he provided an account of the events leading up to and including September 9, 2004. (*Id*.) At his deposition, Paluch stated that this was the first grievance he filed relating to Smith because "I was trying to be cooperative with staff. And filing a grievance while Smith was my celly would be tantamount to placing myself in further jeopardy." (Paluch Dep. 91-92.) Further, Paluch could not be sure that prior to the assault he told any of the Defendants of his fear for his life because of being celled with Smith. (*Id*. at 93.)

A hearing examiner timely conducted hearings on both misconduct reports. On September 17, 2004, the hearing examiner found Paluch guilty of fighting and sanctioned him with sixty (60) days of disciplinary custody. (Doc. 228 at 37.) Paluch subsequently appealed this determination to the Superintendent and the Chief

Grievance Coordinator.[16]  (*Id*. at 46-49.)  He was denied relief on both levels.[17]  (*Id*.)
Further, the hearing examiner dismissed without prejudice the fighting charge against
Smith.  (*Id*. at 41.)

### B.    Procedural History

Throughout the course of this action, the parties engaged in contentious
discovery.  Numerous motions were filed by the parties addressing discovery
problems.  Ultimately, the discovery problems were resolved and the instant motion
for summary judgment was filed by Defendants on August 1, 2008.  (Doc. 225.)
After the court granted six motions for an extension of time in which to file a brief in
opposition to the motion for summary judgment, (Docs. 238, 248, 253, 264, 269 &
272), Paluch filed his brief in opposition and counter-statement of facts on April 9,
2009, (Docs. 281-82).  Defendants filed a reply brief on April 20, 2009, (Doc. 284),
and Plaintiff filed a sur reply on June 9, 2009, (Doc. 288).  The matter is now ripe for
disposition.

---

[16] The responses to Paluch's appeal addressed both Paluch's September 10, 2004 grievance
and the hearing examiner's determination.  (Doc. 228 at 46-49.)

[17] Defendants do not assert that Paluch has not exhausted his administrative remedies.
Therefore, the court is not foreclosed from reviewing the merits of Paluch's claims.

## II.  Standard of Review

Summary judgment is proper when "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to a judgment as a matter of law."  Fed. R. Civ. P. 56(c); *accord Saldana v. Kmart Corp.*, 260 F.3d 228, 231-32 (3d Cir. 2001). A factual dispute is "material" if it might affect the outcome of the suit under the applicable law.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  A factual dispute is "genuine" only if there is a sufficient evidentiary basis that would allow a reasonable fact-finder to return a verdict for the non-moving party.  *Id*.  The court must resolve all doubts as to the existence of a genuine issue of material fact in favor of the non-moving party.  *Saldana*, 260 F.3d at 232; *see also Reeder v. Sybron Transition Corp.*, 142 F.R.D. 607, 609 (M.D. Pa. 1992).

Once the moving party has shown that there is an absence of evidence to support the claims of the non-moving party, the non-moving party may not simply sit back and rest on the allegations in its complaint.  *See Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986).  Instead, it must "go beyond the pleadings and by [its] own affidavits, or by the depositions, answers to interrogatories, and admissions on file, designate specific facts showing that there is a genuine issue for trial."  *Id.* (internal

quotations omitted); *see also Saldana*, 260 F.3d at 232 (citations omitted).  Summary

judgment should be granted where a party "fails to make a showing sufficient to

establish the existence of an element essential to that party's case, and on which that

party will bear the burden of proof at trial."  *Celotex*, 477 U.S. at 322. "'Such

affirmative evidence – regardless of whether it is direct or circumstantial – must

amount to more than a scintilla, but may amount to less (in the evaluation of the

court) than a preponderance.'"  *Saldana*, 260 F.3d at 232 (quoting *Williams v.

Borough of West Chester*, 891 F.2d 458, 460-61 (3d Cir. 1989)).  Further, when

resolution of issues of fact turn on a determination of credibility, summary judgment

is not proper.  *Oliff-Michael v. Mutual Benefit Ins. Co.*, 262 F. Supp. 2d 602, 604 (D.

Md. 2003).

## III.　Discussion

　　Under 42 U.S.C. § 1983, a plaintiff must demonstrate two essential elements:

1) that the conduct complained of was committed by a person acting under color of

state law, and 2) that said conduct deprived the plaintiff of a right, privilege, or

immunity secured by the Constitution and laws of the United States.  *West v. Atkins*,

487 U.S. 42, 48 (1988).  Liability under § 1983 is personal in nature and a defendant

is liable only if he was personally, affirmatively involved in the alleged wrongdoing.

*Robinson v. City of Pittsburgh*, 120 F.3d 1286, 1294 (3d Cir. 1997), *abrogated in part on other grounds by Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53 (2006) (citing *Rode v. Dellarciprete*, 845 F.2d 1195, 1207 (3d Cir. 1988)).  A defendant who supervised the wrongdoer, but did not personally participate in the wrongful act, is not liable under § 1983 on a theory of *respondeat superior* unless he personally directed or had actual knowledge of, and acquiesced in, the deprivation. *Polk County v. Dodson*, 454 U.S. 312, 325 (1981) (citing *Monell v. New York City Dep't of Soc. Servs.*, 436 U.S. 658, 694 (1978)); *Robinson*, 120 F.3d at 1294.  A defendant who lacked any supervisory power over the wrongdoer and who was not personally, affirmatively involved in the alleged wrongful conduct is not liable under § 1983.  *Id*.

In the instant case, Paluch asserts that Defendants violated his Eighth Amendment right to be free from cruel and unusual punishment by failing to protect him from Smith while the two inmates were celled together. In order for Paluch's § 1983 claim to proceed against each Defendant, he must first establish the existence of a constitutional violation.  *Ogden v. Mifflin County*, No. 1:06-cv-2299, 2008 WL 4601931, at *3 (M.D. Pa. Oct. 15, 2008).  Thus, the court will first address this threshold inquiry.

The Eighth Amendment requires a prison official to "take reasonable measures to protect prisoners from violence at the hands of other prisoners." *Farmer v. Brennan*, 511 U.S. 825, 833 (1994). While a prison official has a duty to protect a prisoner from attacks by other prisoners, not every injury suffered by a prisoner at the hands of another translates to constitutional liability for the official responsible for the prisoner's safety. *Id.* at 833-34. Further, every Eighth Amendment claim in this context embodies both an objective and a subjective component. In order for a plaintiff to prove a constitutional violation in a failure-to-protect case, he must demonstrate that: (1) he is "incarcerated under conditions posing a substantial risk of serious harm;" and (2) the prison official acted with deliberate indifference to his health and safety, stated otherwise as he "knows of and disregards an excessive risk to inmate health or safety." *Id.* at 834, 837; *see also Beers-Capital v. Whetzel*, 256 F.3d 120, 125 (3d Cir. 2001); *Hamilton v. Leavy*, 117 F.3d 742, 746 (3d Cir. 1997).

A.    **Substantial Risk of Serious Harm**

As stated above, a prisoner must first demonstrate that "he is incarcerated under conditions posing a substantial risk of serious harm." *Farmer*, 511 U.S. at 834. In making this objective determination of whether the risk of an inmate being assaulted by other inmates is sufficiently serious to trigger constitutional protection under the

Eighth Amendment, "the focus must be, not the extent of the physical injuries sustained in the attack, but rather the existence of a substantial risk of serious harm." *Pearson v. Vaughn*, 102 F. Supp. 2d 282, 290 (E.D. Pa. 2000) (citation omitted).

In the instant case, the court finds that there exists a genuine issue of material fact as to whether Paluch faced a substantial risk of harm. In support, the record contains several facts related to differing religious beliefs and animosity between the two inmates which explains how being celled with Smith posed a substantial risk of serious harm to Paluch. First, the record shows that when Paluch and Smith initially were celled together, they "communicated," but after another inmate erroneously informed Smith that Paluch was Jewish, that communication broke down. (Paluch Dep. 51-52.) Although Paluch is not Jewish, he notes the similarities between his faith, Messianic Yahweism, and Judaism, such as receiving kosher meals, attending Jewish services, and wearing a skullcap similar to a yarmulke. (*Id*. at 36-39.) Further, the record shows that Smith is a white supremacist whose views conflict with those of a person practicing Judaism. (*Id*. at 54; Doc. 282-3 at 2; Doc. 282-4 at 2-3; Doc. 282-5 at 2; Schmidt Dep. 29.) As a result, there exists evidence that Smith may have attacked Paluch because of his religion, which Smith believed was Judaism. Moreover, prior to the September 9th incident, Defendant Dawson told Smith that

21

Paluch was "not white." (Paluch Dep. 40.) Paluch made verbal and written requests addressed to Defendants articulating this animosity between himself and Smith. At his deposition, Defendant Mosley testified that he would have separated a white supremacist from a Jewish person if a request to do so had been made. (Mosley Dep. 11.)

The record also shows that Smith threatened Paluch on August 24, 2004, after Paluch informed the hearing examiner that Smith was solely to blame for the incident involving the mouse on the meal tray. (Paluch Dep. 64.) Paluch informed Defendant Schmidt of the need for a separation at this time, stating "it is possible either one of us is going to get injured." (*Id*. at 83.) He also submitted a written request for a separation to Defendant Kendrick. (Doc. 282-3 at 2.) The evidence demonstrates that Paluch had been seeking a separation from Smith for at least one week prior to the September 9th attack. Paluch indicated to each Defendant that harm would come to either himself or Smith, based on their differing beliefs and the animosity between them, if a separation did not occur. To the contrary, all Defendants deny that Paluch informed them of any serious disagreements between himself and Smith prior to the September 9, 2004 incident. Because resolution of whether Paluch faced a substantial risk of serious harm posed by Smith depends upon a credibility

determination, summary judgment here is not proper. *Oliff-Michael*, 262 F. Supp. 2d at 604.

## B.    Deliberate Indifference

The second prong of the failure-to-protect inquiry requires the court to analyze whether a prison official was, from a subjective standpoint, deliberately indifferent to an inmate's health or safety. *Farmer*, 511 U.S. at 834. Specifically, the question is whether an official consciously knew of and disregarded an excessive risk to the prisoner's well-being. *Id.* at 840-44; *Hamilton*, 117 F.3d at 747. It is not enough to show that the prison official was "aware of the facts from which the inference could be drawn that a substantial risk of serious harm exists." *Farmer*, 511 U.S. at 837. Rather, the prison official "must also draw the inference." *Id.* The official's actual knowledge may be proved by circumstantial evidence. *Beers-Capitol*, 256 F.3d at 131.

In the instant case, Defendants contend that because they were unaware of any significant risk of harm to Paluch posed by Smith, they could not have been deliberately indifferent to any such risk. Specifically, they claim they never observed any behavior between Paluch and Smith that would justify a separation. Paluch, on the other hand, claims that he informed Defendants on numerous occasions prior to

September 9, 2004 of the risk of harm posed by Smith based on their contentious relationship, but Defendants simply ignored him. In fact, Defendant Dawson, according to Paluch, instigated and encouraged the September 9, 2004 attack by Smith. Paluch further claims Defendants were prejudiced against him because of his religion; were retaliating against him for writing a book about prison conditions; and were retaliating against him for filing grievances and lawsuits against them. This prejudice and retaliation, Paluch argues, motivated Defendants to disregard the known risk to Paluch posed by Smith.

The court will examine the record relating to each Defendant for evidence of deliberate indifference.

### 1. __Defendant Schmidt__

Defendant Schmidt contends that he is entitled to summary judgment because the facts show he was not deliberately indifferent to any substantial risk of serious harm to Paluch from Smith. Specifically, Schmidt asserts that because Paluch informed him only that he and Smith were "incompatible" prior to the incident on September 9, 2004, Schmidt was unaware of any risk of an attack on Paluch by Smith. Further, Schmidt claims that because he was unaware of any altercation

between Paluch and Smith on August 24, 2004, he could not have known of the risk of serious harm to Paluch posed by Smith prior to September 9, 2004.

Paluch counters that Schmidt was aware of the risk of harm posed by Smith prior to September 9, 2004, yet failed to protect Paluch from an assault by Smith in deliberate indifference to Paluch's health or safety. In support, John Boskie testified that he overheard Paluch informing Defendant Schmidt of his fear of Smith on numerous occasions prior to September 9, 2004. Further, after Paluch informed Smith of his testimony before the hearing examiner on the meal tray incident on August 24, 2004, he called Schmidt to the cell to not only inform Schmidt that he and Smith were incompatible, but also that "one of us needed to leave this cell, that there is a need for separation, or it is possible either one of us is going to get injured." (Paluch Dep. 83.) It is Paluch's assertion that because of Schmidt's pre-existing prejudice against him,[18] Schmidt failed to follow up on any of Paluch's concerns for his safety.

---

[18] To that extent, Paluch avers that Defendant Schmidt's deliberate indifference towards Paluch's safety with respect to the risk of harm posed by Smith was motivated by Schmidt's prejudice against him for authoring a book on the rights of individuals serving life terms of imprisonment and participating in the Pennsylvania Lifers' Association. As a result, Defendant Schmidt mistreated Paluch by denying him showers, meals, exercise time, and other necessities. Inmate Boskie witnessed this mistreatment prior to the September 9, 2004 incident. Paluch claims this evidence of prejudice against him supports his contention that Defendant Schmidt was deliberately indifferent to the risk of harm posed by Smith.

Resolving all doubt as to the existence of a genuine issue of material fact in favor of Paluch, the non-moving party, the court concludes that a genuine question of material fact exists as to whether Defendant Schmidt was deliberately indifferent to Paluch's safety. Thus, the court will deny Defendants' motion for summary judgment with respect to Defendant Schmidt. *See Oliff-Michael*, 262 F. Supp. 2d at 604 ("When resolution of issues of fact depends upon a determination of credibility, summary judgment is improper.").

### 2. **Defendant Mosley**

Defendant Mosley contends that he is entitled to summary judgment because the facts show he was not deliberately indifferent to any substantial risk of serious harm to Paluch from Smith. Specifically, Mosley asserts that because he did not have the sole authority to move Paluch out of the cell, he could not have been deliberately indifferent to the risk of harm posed by Smith. He also claims he was never told of Paluch's fear of Smith prior to the September 9, 2004 incident, and therefore could not have been deliberately indifferent to the risk of harm posed by Smith.

Paluch counters that Mosley was aware of the risk of harm to Paluch posed by Smith prior to September 9, 2004, yet failed to protect Paluch from an assault by Smith in deliberate indifference to Paluch's health or safety. In support, testimony by

26

inmates Boskie and Bennett indicate that Paluch expressed his fear of Smith to Mosley several times before September 9, 2004.  Further, Paluch states that prior to September 9, 2004, Defendant Mosley believed Paluch was Jewish, yet assigned him to a cell with Smith, a known white supremacist, on August 17, 2004.  Mosley testified that he would grant a request for a separation made by a Jewish person celled with a white supremacist.  In an inmate request sent to Mosley on August 31, 2004, Paluch states that Smith is a white supremacist and that "we cannot co-exist peacefully."  (Doc. 282-5 at 2.)

Resolving all doubt as to the existence of a genuine issue of material fact in favor of Paluch, the non-moving party, the court concludes that a genuine question of material fact exists as to whether Defendant Mosley was deliberately indifferent to Paluch's safety.  Thus, the court will deny Defendants' motion for summary judgment with respect to Defendant Mosley.  *See Oliff-Michael*, 262 F. Supp. 2d at 604 ("When resolution of issues of fact depends upon a determination of credibility, summary judgment is improper.").

### 3.    <u>Defendant Kendrick</u>

Defendant Kendrick contends that he is entitled to summary judgment because the facts show he was not deliberately indifferent to any substantial risk of serious

harm to Paluch from Smith.  Specifically, Kendrick asserts that he only knew Paluch and Smith to be "incompatible," which he understood to mean "not of like personalities." (Kendrick Dep. 11-12.)  He never observed behavior between Paluch and Smith that would have necessitated a cell move, and therefore was justified in believing there was no urgency to separate the two men.  He also contends that because he did not have the sole authority to move Paluch out of the cell, he could not have been deliberately indifferent to the risk of harm posed by Smith.

Paluch counters that Kendrick was aware of the risk of harm to Paluch posed by Smith prior to September 9, 2004, yet failed to protect Paluch from an assault by Smith in deliberate indifference to Paluch's health or safety.  In support, testimony by inmates Boskie and Bennett indicate that Paluch had expressed a fear for his safety with respect to Smith to Defendant Kendrick on several occasions prior to September 9, 2004.  Inmate Bennett heard Kendrick exclaim "yeah, right" when Paluch informed Kendrick that he would be held accountable if anything happened to him at the hands of Smith.  (Bennett Decl. ¶ 5.)  Further, Paluch's written request to Kendrick stating that he and Smith are "not getting along" and "not compatible" because Smith is a white supremacist and Paluch is not, made Kendrick aware of the risk of harm posed

by Smith because prior to September 9, 2004, Defendant Kendrick believed Paluch was Jewish.  (Doc. 282-3 at 2.)

Resolving all doubt as to the existence of a genuine issue of material fact in favor of Paluch, the non-moving party, the court concludes that a genuine question of material fact exists as to whether Defendant Kendrick was deliberately indifferent to Paluch's safety.  Thus, the court will deny Defendants' motion for summary judgment with respect to Defendant Kendrick.  *See Oliff-Michael*, 262 F. Supp. 2d at 604 ("When resolution of issues of fact depends upon a determination of credibility, summary judgment is improper.").

### 4.   <u>Defendant Dawson</u>

Defendant Dawson contends that he is entitled to summary judgment because the facts show he was not deliberately indifferent to any substantial risk of serious harm to Paluch from Smith.  Specifically, he asserts that he was not aware of the risk of harm posed by Smith and thus could not have been deliberately indifferent to that risk.

In support of his claim against Defendant Dawson, Paluch first sets forth background information on his contentious relationship with Dawson, such as Dawson's anti-semitic comments about Paluch and mistreatment of Paluch.  (Paluch

Dep. 26, 40; Boskie Dep. 15-19, 23.)  He then details Dawson's participation in the

September 9, 2004 incident, such as his comment to Smith, "Why don't you F up your

celly for me," (Paluch Dep. 72), and his statement, "Get him," (Bennett Decl. ¶ 10),

made when Smith initially struck Paluch.  Inmates Boskie and Bennett both heard

Dawson's comments which may have in part provoked the attack on Paluch by Smith.

(Boskie Dep. 27; Bennett Decl. ¶¶ 8, 10.)  In response, Defendant Dawson does not

dispute any of Paluch's account with respect to his own behavior, rather states only

that it was Paluch rather than Smith who initiated the altercation.  (Doc. 228 at 33.)

Resolving all doubt as to the existence of a genuine issue of material fact in

favor of Paluch, the non-moving party, the court concludes that a genuine question of

material fact exists as to whether Defendant Dawson was deliberately indifferent to

Paluch's safety.  Thus, the court will deny Defendants' motion for summary judgment

with respect to Defendant Dawson.  *See Oliff-Michael*, 262 F. Supp. 2d at 604

("When resolution of issues of fact depends upon a determination of credibility,

summary judgment is improper.").

## IV.    **Conclusion**

Because a genuine issue of material fact exists regarding the substantial risk of serious harm and Defendants' deliberate indifference, granting summary judgment as to Defendants is not appropriate.

An appropriate order follows.

                                        s/Sylvia H. Rambo
                                        United States District Judge

Dated:  June 16, 2009.

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **JAMES A. PALUCH,** | : | |
| | : | |
| **Plaintiff** | : | **CIVIL NO. 1:CV-06-01751** |
| | : | |
| **v.** | : | **(Judge Rambo)** |
| | : | |
| **J. DAWSON,** *et al.*, | : | |
| | : | |
| **Defendants** | : | |

# O R D E R

**AND NOW**, this 16th day of June, 2009, in accordance with the foregoing

memorandum, **IT IS HEREBY ORDERED THAT** Defendants' motion for

summary judgment (Doc. 225) is **DENIED**.

s/Sylvia H. Rambo
United States District Judge